**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 25-CR-80100-WPD**

UNITED STATES OF AMERICA,

      **Plaintiff,**

v.

MICHAEL BRETSIK,

      **Defendant.**

_____/

**DEFENDANT'S SENTENCING MEMORANDUM**
**AND REQUEST FOR A REASONABLE SENTENCE**

Defendant, **MICHAEL BRETSIK** ("**Mr. Bretsik**" or "**Michael**"), by and through undersigned counsel, and pursuant to 18 U.S.C. § 3553(a), hereby files this Sentencing Memorandum and moves this Court to impose a reasonable sentence, all facts and circumstances considered.

## I.      INTRODUCTION

On June 24, 2025, Mr. Bretsik was charged by Indictment with twelve (12) counts of distribution of child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A) (Counts 1–12). (D.E. 10). On September 30, 2025, Mr. Bretsik pled guilty to Counts 1 and 2 of the Indictment. (D.E. 39). Sentencing is set for January 8, 2026. (D.E. 39).

Given the mitigating factors set forth herein, Mr. Bretsik respectfully requests that the Court impose a reasonable sentence below the advisory guideline range that is sufficient—but not greater than necessary—to satisfy the factors outlined in 18 U.S.C. § 3553(a). See Kimbrough v. United States, 552 U.S. 85, 101 (2007).

## II.     ADVISORY GUIDELINES CALCULATIONS

### A.     UNCONTESTED GUIDELINE PROVISIONS

U.S.S.G. § 2G2.2 is the applicable guideline for violations of 18 U.S.C. § 2252A(a)(2)(A). For purposes of calculating the advisory guideline range, Counts 1 and 2 are grouped together. See U.S.S.G. §§ 3D1.2(d) and 3D1.3(b). The base offense level is twenty-two (22). See U.S.S.G. § 2G2.2(a)(2).

Mr. Bretsik agrees that a two (2)-level enhancement is appropriate because he distributed material involving a prepubescent minor or a minor who had not reached the age of twelve (12) years. See U.S.S.G. § 2G2.2(b)(2). Pursuant to U.S.S.G. § 2G2.2(b)(3)(F), another two (2)-points are added to Mr. Bretsik's offense level because he knowingly engaged in the distribution of child pornography. In addition, a four (4)-point increase to the offense level applies because the offense involved material that portrayed sexual abuse of an infant or toddler. See U.S.S.G. § 2G2.2(b)(4). The offense also involved the use of a computer or an interactive computer service to distribute the child sexual abuse material, resulting in another two (2)-level enhancement. See U.S.S.G. § 2G2.2(b)(6). Lastly, under U.S.S.G. § 2G2.2(b)(7)(D), there is a five (5)-point increase to Mr. Bretsik's offense level because the offense involved more than six-hundred (600) images. As such, Mr. Bretsik's adjusted offense level is thirty-seven (37).

Pursuant to U.S.S.G. § 3E1.1(a), the offense level should be reduced by two (2) points based on Mr. Bretsik's acceptance of responsibility. See Plea Agreement at ¶ 10. (D.E. 40). The Government has also agreed to file a motion requesting an additional (1)-level decrease to the base offense level under U.S.S.G. § 3E1.1(b), due to Mr. Bretsik's assistance and timely cooperation with the investigation of his misconduct. Id.

**B.      TOTAL OFFENSE LEVEL**

A resulting total offense level of thirty-four (34) and criminal history category of I produces an advisory sentencing guideline range of 151 to 188 months' imprisonment. However, as further detailed below, several mitigating factors support a much lower, more reasonable sentence.

### III.      APPLICATION OF THE 18 U.S.C. § 3553(a) FACTORS

As this Court well knows, "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." Nelson v. United States, 555 U.S. 350, 352 (2009); see also Gall v. United States, 552 U.S. 38, 39 (2007) (a district judge "**may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts presented**") (emphasis added). "The corollary of that proposition is that district judges have an obligation to consider whether a sentence other than a Guidelines sentence would be sufficient, but not greater than necessary, to serve the purposes of sentencing" under 18 U.S.C. § 3553(a). See United States v. Corsey, 723 F.3d 366, 382 (2d. Cir. 2013) (Underhill, J., concurring).

At Sentencing, 18 U.S.C. § 3553(a) obliges the Court to consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, deter criminal conduct, protect the public, and provide the defendant with needed educational or vocational training and medical care; (3) the kinds of sentences available; (4) the applicable advisory sentencing guidelines range; (5) pertinent Sentencing Commission policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims.

See 18 U.S.C. § 3553(a)(1)–(7).

Mr. Bretsik respectfully asks this Court to look beyond the advisory sentencing guidelines range, focus on the principles delineated by the United States Supreme Court and the applicable factors set forth in 18 U.S.C. § 3553(a), and thereafter impose a fair, just, and reasonable sentence.

## A.  MR. BRETSIK' PERSONAL HISTORY AND CHARACTERISTICS

Congress has directed that a defendant's personal characteristics should be considered equally with "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). Yet these factors are given no weight in the guideline calculation. Indeed, the guidelines recognize only the defendant's criminal record (providing for higher offense levels for a greater criminal history, rather than reductions for no prior record). See Rita v. United States, 551 U.S. 338, 364–65 (2007) ("The Commission has not developed any standards or recommendations that affect sentencing ranges for many individual characteristics. Matters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, lack of guidance as a youth, family ties, or military, civil, charitable, or public service are. . . matters that § 3553(a) authorizes the sentencing judge to consider."); see also United States v. Prosperi, 686 F.3d 32, 39, 45 (1st Cir. 2012) (affirming a downward variance from an advisory guideline range of 87–108 months to home detention because the guidelines did not take into account the defendant's personal characteristics). Mr. Bretsik respectfully asks that the Court balance the advisory sentencing guideline calculations by considering his personal history and characteristics that weigh in favor of a below-guidelines sentence.

Michael Bretsik was born on March 6, 1971 in Dearborn, Michigan, and is the eldest of three (3) siblings. His father, Michael Laurence Bretsik, was a welder by trade but held various odd jobs throughout his lifetime, while Michael's mother, Leona, was a homemaker.

4

Growing up, Michael's parents ensured that the family's basic needs were met, but they were never financially stable and at times relied on food assistance programs to get by. Michael did not have a strong or positive relationship with his father, who was an uninvolved parent with a short temper—which at times culminated in verbally abusive episodes directed at Michael, his sisters, and his mother. Michael was closer to his mother, who shouldered the responsibility of raising the children and maintaining the household, although she too was unaffectionate and provided "tough love" as a parent.

Michael lacked a clear sense of direction as a teenager and young adult. He was a decent student in school, though he did not have any particular passions or strong motivations to achieve wealth or status. Michael has, however, always had an extremely strong work ethic.

At age fourteen (14), Michael started working as a bagger at a local grocery store. After graduating from high school, Michael enrolled at Henry Ford Community College in Dearborn. Michael did not finish his undergraduate degree at that time, and he instead entered the workforce. Michael held various full-time jobs before starting his career in the automotive industry in 2008 as a salesman for TRW Automotive, an auto parts supplier that later became part of ZF Group, a major international auto parts manufacturer and supplier. In 2010, Michael returned to college at Cleary University, where he took evening courses while working full-time. In 2013, Michael graduated *summa cum laude* and obtained his Bachelor's Degree in Business Administration. Years of hard work and sacrifice led Michael to becoming a Sales Director at ZF Group, his most recent role before he resigned from the company due to the instant charges. In total, Michael worked for TRW Automotive and ZF Group for seventeen (17) years before his arrest in this case.

In 1996, Michael met his first wife, Denise Dominick, and the pair married in 2001. In 2005, Michael's son, Evan, was born. Being Evan's father is Michael's proudest achievement. Due

to the distant relationship Michael had with his own father, he committed to being a present, nurturing, and loving parent to his son.  In Michael's own words, "Evan is my life, heart, and soul." Michael's desire to provide a better life for Evan was partially why he returned to college to finish his undergraduate degree. Evan was diagnosed with Duchenne Muscular Dystrophy in 2011, which devastated Michael and further strained his already failing relationship with his ex-wife. The impact of Evan's condition on Michael's life, as well as Michael's role as Evan's dedicated caretaker, is further detailed in Subsection B, infra. Despite Michael's efforts to preserve his first marriage, his ex-wife pushed to divorce in 2016. The divorce was a very difficult and emotionally heavy chapter for Michael. However, in 2016, Michael met his current wife, Wendy Bretsik, who he describes as the love of his life. After several years of dating, Michael and Wendy were married in 2021.

It is difficult to understand how Michael, who is a hardworking, dedicated husband and father, found himself before the Court for the charges he now faces. Michael was approximately nine (9) or ten (10) years old when he first viewed adult pornographic material that belonged to his father. After he discovered pornography, Michael watched it throughout his life. Although Michael never saw his pornography consumption as an issue, the combination of his high-stress job, failing marriage and subsequent divorce, and raising a child with a major disability caused Michael to  lean heavily on pornography as an escape from his everyday life and problems. Over time, Michael's increased viewing of pornography "snowballed" and led to him losing himself in a world that he does not belong in nor want to be a part of. Michael did not start using pornography with the intention of viewing, possessing, or much less distributing child sexual abuse material. However, Michael's addiction to pornography ultimately resulted in him encountering child sexual abuse material in online chatrooms that he participated in. By that point, Michael's excessive

consumption of pornography clouded his ability to recognize the wrongfulness and illegality of the images he viewed and shared in these online chatrooms. To be clear, Michael does not offer this information to the Court as an excuse to justify his conduct in any way, but rather as a partial explanation for same.

There are no words to articulate the depth of shame, regret, remorse, and embarrassment thar Michael feels. Michael carries immense guilt for the harm that his actions caused the victims, who he acknowledges are re-victimized every time the images of their abuse are disseminated, as well as for the pain and suffering he caused to those closest to him (particularly his wife, son, and stepchildren). As a result of his conduct, Michael has lost friendships, had his career end abruptly, and worst of all, become estranged from his son. In addition, although not directly tied to the charged offense conduct, Michael's decision to secretly record his wife during a moment of intimacy is something that he will never forgive himself for doing.

Michael respectfully asks the Court not to judge who he is solely based on the offense conduct. To those who know him, Michael has always been a loving brother, son, friend, father, and husband who is always willing to help others in times of need. Michael is not a pedophile or child abuser, but rather someone who found himself caught in the throes of an addiction to pornography that overcame his judgement.

In its remarks on the effect of incarceration on first-time, nonviolent offenders, the First Circuit in Prosperi recognized the punishment inherent to those who are thrust into the criminal justice system:

> I think it is very difficult at times, for those of us who are judges or prosecutors or lawyers, to put ourselves in the shoes of a person with no prior experience with the criminal justice system who finds himself or herself accused of a crime. I do not think, sometimes, we fully recognize the anguish and the penalty and the burden that

7

> persons face when called to account, as these men are, for the wrong
> that they committed.

686 F.3d at 48. Mr. Bretsik urges the Court to take his personal characteristics and life history into account when determining his sentence.

**B.      MR. BRETSIK'S ROLE AS A CARETAKER FOR HIS SEVERELY DISABLED SON**

A defendant's role as a caretaker of another is an appropriate consideration for the Court as it decides whether to impose a below-guidelines sentence. See United States v. Wadena, 470 F.3d 735 (8th Cir. 2006) (affirming district court's downward variance from advisory guideline range of eighteen (18) to twenty-four (24) months' imprisonment to five (5) years of probation based, in part, on defendant's role as the primary caretaker for his adult son with fetal alcohol syndrome).

As previously mentioned, Mr. Bretsik's son was diagnosed with Duchenne Muscular Dystrophy ("DMD") in 2011. DMD is a progressive and severe muscle-wasting condition that primarily affects males. See "About Duchenne Muscular Dystrophy," the Muscular Dystrophy Association.[1] In the early stages, DMD affects the muscles in one's shoulders, upper arms, hips, and thighs, making it difficult to perform basic movements. Id. By early adolescence, most boys with DMD lose the ability to walk and require the use of a wheelchair. Id. Eventually, the disease affects the heart and lungs, leading to either heart or breathing failure. See "Signs and Symptoms," the Muscular Dystrophy Association.[2] Those with DMD have shortened life expectancies, and often die in their late teens or twenties, though a small percentage survive beyond the third decade of life. Id.

---

[1] Available at: https://www.mda.org/disease/duchenne-muscular-dystrophy
[2] Available at: https://www.mda.org/disease/duchenne-muscular-dystrophy/signs-and-symptoms

Evan lost his ability to walk at age sixteen (16). Today, Evan is twenty (20) years old and his condition has rendered him totally reliant on others to perform even the most basic daily tasks. Mr. Bretsik and his ex-wife evenly split custody of Evan after their divorce and have continued to share the responsibility of caring for their son. Prior to being arrested, Mr. Bretsik would care for Evan fifty (50) percent of the time. Whenever Evan was with him, Mr. Bretsik's daily caretaking responsibilities included, but were not limited to: (1) dispensing his son's medication; (2) showering, drying off, and dressing his son; (3) emptying and cleaning personal urinal containers; (4) providing assistance with grooming/shaving; (5) unscrewing bottle caps on drinks; and (6) applying testosterone cream nightly.

Although Evan's diagnosis was life-altering, Mr. Bretsik has done his best to provide his son with a normal upbringing. Mr. Bretsik has arranged for Evan to participate in disabled youth hunts through the Outdoor Dream Foundation, Turkey Tracks of Michigan, and the Foundation for Hope, as well as baseball and bowling programs through the Miracle League of Michigan. Mr. Bretsik has also taken Evan to as many University of Michigan football games and NASCAR races as possible. Mr. Bretsik remodeled his residence extensively to make it more accessible for Evan, including modifying the home's entrance, installing an elevator, and redoing an entire bathroom and shower to accommodate the use of Evan's powerchair. Mr. Bretsik has invested heavily in motorized wheelchairs and a minivan with an electric ramp to make it easier for Evan to enter and exit the car. In addition, over the years Mr. Bretsik has donated both his time and money to various charities dedicated to supporting those living with DMD, including: Mitchell's Run Thru

Rockford,[3] Nathan's Ninjas,[4] Team Joseph,[5] Braeden's Bridge,[6] CureDuchenne,[7] and the Parent Project Muscular Dystrophy[8].

Unfortunately, Mr. Bretsik's arrest has strained his relationship with Evan. It is impossible for Mr. Bretsik to express the amount of pain this situation has caused him. Feeling like he has failed his son is undoubtedly the worst consequence that Mr. Bretsik has faced as a result of his conduct. Regardless, Mr. Bretsik is determined to repair his relationship with Evan and do whatever is necessary to continue caring for his son after he has served his sentence. Mr. Bretsik respectfully requests that the Court take into account Mr. Bretsik's need to be present in Evan's life as one of his fifty-percent caretakers, as well as Evan's potentially shorter life expectancy, as it considers an appropriate sentence for him.

## C. MR. BRETSIK'S EARLY ACCEPTANCE OF RESPONSIBILITY

One of the goals of sentencing is rehabilitation. See Williams v. New York, 337 U.S. 241, 248 (1949). A defendant's admission of responsibility or expression of contrition "is often a significant first step towards his rehabilitation and, for that reason, deserving of a possible reward in the form of a lessened sentence." Smith v. Wainwright, 664 F.2d 1194, 1196 (11th Cir. 1981). Furthermore, "[a] sentencing court has the power to consider a defendant's cooperation under § 3553(a), irrespective of whether the Government files a § 5K1.1 motion." See United States v. Robinson, 741 F.3d 588 (5th Cir. 2014); see also United States v. Landrón Class, 696 F.3d 62 (1st

---

[3]Additional information about this organization is available at: https://mitchellsrun.org/about/
[4]Additional information about this organization is available at: https://www.facebook.com/nathansninjas/
[5]Additional information about this organization is available at: https://www.teamjoseph.org/
[6]Additional information about this organization is available at: https://braedansbridge.squarespace.com/
[7]Additional information about this organization is available at: https://cureduchenne.org/
[8]Additional information about this organization is available at: https://www.parentprojectmd.org/

Cir. 2012); United States v. Massey, 663 F.3d 852 (6th Cir. 2011); United States v. Leiskunas, 656 F.3d 732 (7th Cir. 2011); United States v. Doe, 398 F.3d 1254 (10th Cir. 2005).

Unlike defendants who do not acknowledge their wrongful behavior, Mr. Bretsik fully accepted responsibility for his actions at issue here. He understands that there is no excuse for his conduct, and he has taken substantial steps to address the root causes of same and to better himself. While in pretrial detention, Mr. Bretsik (who is Christian) began studying the Bible. Since his release on bond, Mr. Bretsik has become more engaged with his faith through daily prayer and Bible study, as well as weekly attendance for mass at NorthRidge Church in Brighton, Michigan. In December of 2025, Mr. Bretsik was baptized at home by his pastor. In addition, Mr. Bretsik receives weekly psychotherapy from Eugene M. Kroll, a Limited Licensed Psychologist and Certified Advanced Alcohol and Drug Counselor, weekly treatment from Jennifer M. Zoltowski, a Limited Licensed Psychologist and Certified Clinical Sexual Offender Treatment Specialist (which began after her psychosexual evaluation of Mr. Bretsik), and also participates in weekly group therapy through Shanle Psychological Services. While the out-of-pocket financial cost of these mental health treatments is high, Mr. Bretsik hopes that the Court sees he is truly remorseful for what he has done and that he is committed to never reoffending again.

Mr. Bretsik respectfully requests that the Court consider his complete acceptance of responsibility, in conjunction with the other mitigating factors detailed herein, as grounds for a variance below the advisory guideline range. See Roberts v. United States, 445 U.S. 552, 558 (1980) (stating a defendant's cooperation demonstrates that the defendant "will transgress no more…respond to rehabilitative efforts…[and] not deem himself at war with his society.").

**D.      MR. BRETSIK'S LOW RISK OF RECIDIVISM**

The combination of Mr. Bretsik's personal characteristics and data gleaned from research on recidivism rates for those convicted of non-production child pornography offenses indicates there is almost no chance of him reoffending.

In 2021, the United States Sentencing Commission published a report on the prosecution, sentencing, and recidivism outcomes for defendants convicted of non-production child pornography offenses. See "Federal Sentencing of Child Pornography: Non-Production Offenses," United States Sentencing Commission (June 2021).[9] The Sentencing Commission's recidivism study used a sample of 1,093 offenders released or placed on probation in 2015 who were then tracked for three (3) years. Id. at 63. Based on this analysis, the Sentencing Commission found the sexual recidivism rate for all non-production child pornography offenders to be 4.3% from the sample studied. Id. at 65.  Notably, only 1.3% of tracked offenders were re-arrested for a contact sex offense, and only 3.3% of defendants committed a non-contact sex offense following their release or placement on probation.  Id. These findings suggest that the statistical probability of Mr. Bretsik reoffending is extremely low.

On September 18, 2025, at the suggestion of counsel, Mr. Bretsik underwent a psychosexual evaluation performed by Jennifer Zoltowski ("Ms. Zoltowski"). Following the administration of several psychological tests, Ms. Zoltowski concluded, inter alia, "that Mr. Bretsik falls in the low risk [sic] category [to] reoffend." See Psychological Evaluation and Psychosexual Risk Assessment, filed separately under seal, at 7. After the psychosexual evaluation, Mr. Bretsik has seen Ms. Zoltowski for weekly specialized therapy to address his

---

[9]      Available      at:      https://www.ussc.gov/research/research-reports/federal-sentencing-child-pornography-non-production-offenses

sexual behaviors. In addition, Mr. Bretsik has participated in weekly psychotherapy with Eugene Kroll, who observed that Mr. Bretsik "has been consistent, engaged, and motivated in treatment, demonstrating openness to feedback and a willingness to confront painful aspects of his behavior and history." See Psychotherapy Progress Report, filed separately under seal, at 2. Mr. Bretsik also maintains the support of his wife, siblings, and a few friends who are aware of the charges and will continue to be there for him when he is released from prison.

Mr. Bretsik respectfully requests that the Court, when fashioning his sentence, consider that he poses no risk of reoffending.

**E.      THE CHILD PORNOGRAPHY GUIDELINE WAS NOT DEVELOPED USING AN EMPIRICAL APPROACH**

District Courts around the country and the Federal Sentencing Commission have recognized that U.S.S.G. § 2G2.2 "is a Guideline that is fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires."  See United States v. Dorvee, 616 F.3d 174, 184 (2d Cir. 2010).

In its June 2021 report on trends in the prosecution and sentencing outcomes of defendants charged with non-production child pornography offenses, the Sentencing Commission explained that, due to lengthy sentences defendants received under this guideline, "there had been a steady increase in the percentage of sentences imposed below the applicable guideline range in non-production child pornography cases, which indicated that courts increasingly believed the sentencing scheme for such offenders was overly severe." See "Federal Sentencing of Child Pornography: Non-Production Offenses," United States Sentencing Commission (June 2021) at 1.

Of particular concern are the various enhancements under U.S.S.G. § 2G2.2, which, due to advancements in technology, are routinely applied in almost all non-production child pornography

cases despite being reserved for only the most serious child pornography offenses. The Sentencing Commission observed that:

> § 2G2.2 contains a series of enhancements that have not kept pace with technological advancements. Four of the six enhancements— accounting for a combined 13 offense levels—cover conduct that has become so ubiquitous that they now apply in the vast majority of cases sentenced under § 2G2.2.
>
> For example, in fiscal year 2019, over 95 percent of non-production child pornography offenders received enhancements for use of a computer and for the age of the victim (images depicting victims under the age of 12).

Id. at 4; see also Dorvee, 616 F.3d at 186 (explaining that § 2G2.2's sentencing enhancements "routinely result in Guidelines projections near or exceeding the statutory maximum [punishment], even in run-of-the-mill cases," which is a result that is "fundamentally incompatible with § 3553(a).").

Using sentencing data from fiscal year 2019, the Sentencing Commission noted that district courts have responded to the need to differentiate between more serious/more culpable offenders charged with non-production child pornography crimes by imposing downward variances in the majority (59.0%) of non-production child pornography cases. See "Federal Sentencing of Child Pornography: Non-Production Offenses," United States Sentencing Commission (June 2021) at 5. Non-government sponsored below range variances accounted for 42.2 percent of those sentences imposed. Id.

Mr. Bretsik is not minimizing his criminal conduct in any way. However, he asks that the Court take into account these aforementioned, structural deficiencies in the various enhancements contained within U.S.S.G. § 2G2.2 when fashioning an appropriate sentence in his case.

**F.     DETERRENCE DOES NOT REQUIRE INCARCERATION FOR MR. BRETSIK**

The theory of "general deterrence" as a justification for imprisonment is premised on the idea that prospective offenders will rationally consider potential consequences before committing a crime. However:

> [T]he high variability across types of offenders and offences, and lack of satisfactory evidence demonstrating offender rationality in practice, makes it impossible to assume all or most offenders rationally consider commission of a crime before committing it. The strongest argument against deterrence theory is the overwhelming body of evidence suggesting that humans do not make conscious, rational decisions at all times. An overview of the…theories and research surrounding irrational criminal decision-making shows that punishment as a general deterrent is ineffective.

See Athula Pathinayake, Should We Deter Against General Deterrence?, 9 Wake Forest J.L. & Pol'y 63, 88–89 (2018).

Indeed, a lengthy term of incarceration "may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." Gall 552 U.S. at 54.

Mr. Bretsik respectfully requests this Court consider that a below-guidelines sentence would afford him the opportunity to receive mental health treatment better suited to addressing his needs.  He is a first-time offender with the ability to be rehabilitated, and a substantial period of imprisonment is not necessary to deter him from committing any future crimes.  See United States v. Autery, 555 F.3d 864 (9th Cir. 2009) (holding district court's downward variance to probation from guidelines of forty-one (41) to fifty-one (51) months for defendant convicted of possession of child pornography was not unreasonable, in part because of district court's determination that incarceration "would undermine" the defendant's rehabilitation and that "probation with psychiatric treatment was a more appropriate sentence" than incarceration); see also United States

15

v. Cherry, 487 F.3d 366, 370 (6th Cir. 2007) (affirming district court's forty-three (43) percent variance below the advisory guideline range based on the defendant's "understanding of the need to change" and his ability to do so through mental health treatment).

In addition to the punishment imposed by this Court, Mr. Bretsik will bear the collateral consequences of this conviction for the rest of his life, including his permanent status as a felon and applicable sex offender registration requirements. See United States v. Stewart, 590 F.3d 93, 141 (2d Cir. 2009) (stating that "it is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence").

In light of these considerations, Mr. Bretsik asks this Court to vary below the advisory guideline range because a lengthy term of imprisonment is unnecessary to deter him from committing further crimes, and because a lesser and more reasonable period of imprisonment will permit him to receive the mental health treatment he needs.

## IV.      <u>CONCLUSION</u>

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate . . . the crime and the punishment to ensue." <u>Koon v. United States</u>, 518 U.S. 81, 113 (1996). Despite the seriousness of his offense, Mr. Bretsik respectfully submits that a below-guidelines sentence is appropriate, and prays that the Court recognizes his sincere remorse and commitment to never reoffending again.

Respectfully submitted,

**GRAYROBINSON, P.A.**
Attorneys for Defendant
333 S.E. 2nd Avenue, Suite 3200
Miami, Florida 33131
Telephone: (305) 416-6880
Facsimile: (305) 416-6887
brian.bieber@gray-robinson.com
alek.ubieta@gray-robinson.com

By:      s/Brian H. Bieber
         BRIAN H. BIEBER
         Florida Bar #8140

By:      s/Alek Ubieta
         ALEK UBIETA
         Florida Bar #1039546

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 27, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

s/Brian H. Bieber
BRIAN H. BIEBER

s/Alek Ubieta
ALEK UBIETA